UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

MATTHEW A. MCMURRAY,      )
                                   )
             Plaintiff,       )
                                   )
v.                          )     No. 2:16-CV-270
                                   )
EASTMAN CHEMICAL COMPANY,  )
                                   )
           Defendant.    )

## MEMORANDUM OPINION

This matter is before the Court on Defendant's Motion for Summary Judgment [doc. 13], Defendant's Brief Supporting the Motion [doc. 14], Plaintiff's Response [doc. 19], Defendant's Reply [doc. 22], and Plaintiff's Sur-Reply [doc. 27]. For the reasons herein, the Court will deny Defendant's motion.

## I.    BACKGROUND

Plaintiff Matthew A. McMurray is a former employee of Defendant Eastman Chemical Company ("Eastman"), where he worked as a boiler auxiliary operator. [Pl.'s Dep., doc. 15-4, at 8:11–20; Pl.'s Aff., doc. 21, ¶ 2].[1] On June 10, 2013, Mr. McMurray became ill and missed work, and early in the next day, he emailed his supervisor and notified him of his intention to take thirty-six hours of medical leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601. [Email, doc. 20-1, at 1]. Mr. McMurray

---

[1] Pincites to the record refer to the electronic page numbers.

informed him that he planned "to have FMLA papers filled out." [*Id.*]. In a reply email, his supervisor wrote, "OK." [Pl.'s Aff. ¶ 3].

On June 13, 2013, Mr. McMurray visited his physician's office and saw a nurse practitioner, Dawn Smith, who diagnosed him with a viral infection and prescribed medication for him. [FMLA Certification Form, doc. 20-2, at 1]. On Mr. McMurray's behalf, she completed an FMLA Certification Form, in which she verified his illness and noted that he is unable to perform his job because of his illness. [*Id.*]. Mr. McMurray asked her to send the form to his employer. [Pl.'s Aff. ¶ 4]. Although Mr. McMurray was aware that Eastman's FMLA Policy [doc. 20-4] allowed him to wait to submit his FMLA form until after he returned to work,[2] he chose to send it in early "in order to fully protect" himself. [Pl.'s Aff. ¶ 10; *see* FMLA Policy at 1]. The office's staff told him that it mailed the form to Eastman. [Pl.'s Aff. ¶ 4].

During Mr. McMurray's absence from work, Eastman continued to pay him his regular wages, [Earnings Statement, doc. 15-16, at 1–5], under its Short-Term Disability Plan ("Plan") [doc. 15-17], whose benefits to employees include "continuation of all or a portion of" their salary when they are "unable to work because of a non-occupational illness," [*id.* at 1]. Under the Plan, Eastman's employees become *eligible* for benefits if they are "unable, due to a medical condition, to perform [their] regular duties," so long as

---

[2] When an absence occurs due to a foreseeable health condition, an employee may submit his FMLA paperwork within twenty days of returning to work at Eastman, but when it is due to an unforeseeable health condition, an employee must submit his FMLA paperwork within two business days of returning to work. [FMLA Policy at 1]. According to Eastman, Mr. McMurray had twenty days to submit his FMLA paperwork following his return to work. [Summar Decl., doc. 15-1, ¶ 2].

their work did not create the condition. [Plan at 2]. "In all cases of disability lasting 36 or more work hours," employees must provide Eastman with medical evidence that confirms their disability, "no later than 20 days after Eastman requests [it]." [*Id.* at 3]. Also, they must furnish Eastman with certain documents no later than two days after it requests them, including: (1) a Medical Evaluation Report Form TED 10975 ("MERF"), (2) a release of their medical information, and (3) any other documents necessary for Eastman to validate the existence of a disability. [*Id.* at 3].

After learning that Mr. McMurray had missed more than thirty-six hours of work because of an illness, Heather Robinson, a nurse in Eastman's Work Reentry Department, mailed a Work Reentry Packet to his address on file. [Robinson Decl., doc. 15-2, ¶ 2]. The packet, which she shipped to him on June 17, 2013, contained "information on how to remain compliant with Eastman's Short-Term Disability program," a MERF, and FMLA paperwork. [*Id.*]. He received the packet. [Pl.'s Dep. at 15:8–23; Pl.'s Aff. ¶ 13].

On June 21, 2013, Mr. McMurray attempted to return to work. [Pl.'s Aff. ¶ 6; Nurse Bowser's R., doc. 20-3, at 1–2]. He reported to Eastman's medical department,[3] where April Bowser, a senior occupational health nurse, examined him and decided to send him home. [Nurse Bowser's R. at 1–2]. After her exam, she generated a report in which she informed Mr. McMurray's supervisor that Mr. McMurray has a "medical condition" that requires not only his "absence from work" but also "medical clearance prior to returning to work." [*Id.* at 1]. A few days later, he revisited his physician's office, where a second

---

[3] Under the Plan, an employee must "report to the Medical Department for a medical evaluation" after missing thirty-six hours of work. [Plan at 3].

nurse practitioner, Jill Fleming, examined him and, like Ms. Smith, she documented his illness as a viral infection. [McMurray Chart, doc. 15-7, at 7]. Mr. McMurray presented a new FMLA form to the office's staff and, once again, requested that his physician complete it and forward it to Eastman. [Pl.'s Dep. at 12:13–21].

On July 1, 2013, he went back to his physician's office, where Ms. Smith examined him again and prepared a Second FMLA Certification Form [doc. 15-9] on his behalf. In the form, she added a diagnosis—hypertension—and wrote that Mr. McMurray is unable to perform "[a]ll job functions from 6/28/13 [to] 7-11-13." [Second FMLA Certification Form at 2]. Around this time, Mr. McMurray heard rumors that Eastman was going to fire him, and he reacted by reaching out to his supervisors. [Pl.'s Aff. ¶ 9]. They expressed no problems with his FMLA leave, [*id.*], so Mr. McMurray "believed that [he] was on FMLA-protected leave," [*id.* ¶ 7].

Later in the month, however, Ms. Robinson spoke with him and she explained to him that she had not yet received necessary medical documentation from his medical providers; specifically, she requested a MERF. [Robinson Decl. ¶ 5]. She informed him that it was essential for compliance with the Plan. [*Id.*]. Mr. McMurray indicated to her that did not apply for disability benefits, and he was unaware that Eastman was depositing these benefits into his account. [Pl.'s Aff. ¶¶ 16, 18].[4] According to Mr. McMurray, she

<hr />

[4] An employee's participation in the Plan is not mandatory; in other words, the Plan does not obligate an employee to apply for and receive disability benefits either prior to or during medical leave. [Pl.'s Aff. ¶¶ 47, 53]. Eastman does not argue otherwise, though it does state that it has a policy of terminating employees who do actually apply for disability benefits and then fail to comply with the Plan. [Summar Decl. ¶ 5].

identified no problems with his FMLA leave, [*id.* ¶ 21]; instead, "her priority was short-term disability documentation and not Family Medical Leave papers." [Pl.'s Dep. at 13:19–20; *see* Pl.'s Aff. ¶ 21].

Afterwards, Mr. McMurray asked Ms. Smith to complete a new FMLA form and a MERF, and he personally delivered these forms to Eastman's medical department, where he gave them to the receptionist—a "mature gray-headed lady" who said that she would transmit them to the proper person in the department. [Pl.'s Aff. ¶¶ 22–23, 27, 32]. In the past, he had hand-delivered his leave-related papers to the medical department with no issues. [*Id.* ¶ 24].[5] In early August, he received an updated FMLA form and MERF from his physician's office. [*Id.* ¶ 25]. He hand-delivered each of these forms to Eastman's medical department. [*Id.* ¶¶ 26–27, 32]. The receptionist, "a different lady than before," instructed him to place them in Ms. Robinson's mailbox on the wall, and he followed her instructions. [*Id.* ¶ 26].

A week into August, however, Ms. Robinson left a voicemail on Mr. McMurray's phone, telling him that she still did not have necessary medical documentation and that he needed to come in to complete paperwork. [Robinson Decl. ¶¶ 6–8; Pl.'s Aff. ¶ 27]. When he arrived at Eastman's medical department on August 19, 2013, Ms. Robinson insisted that she had "not received any [disability] paperwork." [Robinson Decl. ¶ 9]. She directed him to provide Eastman with a MERF. [*Id.*]. He advised her that, on two prior occasions, he had delivered a MERF to Eastman, along with his FMLA forms. [*Id.*; Pl.'s Aff. ¶ 32;

---

[5] Mr. McMurray had requested FMLA leave from Eastman "once, maybe twice" in the past. [Pl.'s Dep. at 16:9].

Robinson Notes, doc. 21-8, at 3]. According to Mr. McMurray, she said that Eastman "did not need [his] FMLA paperwork" but "needed [disability] papers." [Pl.'s Aff. ¶ 32]. He replied that he was not opting for disability benefits but only FMLA leave. [*Id.* ¶ 31]. She then requested his signature on a release form, which authorized Eastman to obtain his medical records. [Robinson Decl. ¶ 10]. He cooperated with her request and signed the release form. [*Id.*; Pl.'s Aff. ¶ 32]. Ms. Robinson received his records that day and found neither a MERF nor evidence of medical restrictions. [Robinson Decl. ¶ 10].

On the following day, Mr. McMurray visited his physician, who ordered him to undergo numerous tests. [Pl.'s Aff. ¶ 38; Robinson Notes at 4]. Ms. Fleming completed a new FMLA form and MERF, [Pl.'s Aff. ¶ 39], in which she described Mr. McMurray's primary diagnosis as "[u]ncontrolled" hypertension, [MERF, doc. 21-10, at 1]. She also listed various work-related restrictions for Mr. McMurray, including an inability to use a respirator, [*id.* at 1], which was a regular part of his job, [Pl.'s Dep. at 23:1–7]. She wrote that his restrictions would remain in effect for one to two weeks, and she required him to return for a follow-up appointment in three days. [MERF at 1].

Mr. McMurray went back to Eastman's medical department on that same day and handed his MERF and FMLA form directly to Ms. Robinson. [Pl.'s Aff. ¶ 39; Robinson Notes at 4]. According to Mr. McMurray, she examined these documents and "remarked that [his] doctor was putting [him] off work for one to two more weeks until he could get the various tests completed" and that "that was 'fine.'" [Pl.'s Aff. ¶ 39]. She then reviewed the MERF with the medical department's physician; he stated that Mr. McMurray's physician would have to complete his "next" MERF. [Robinson Notes at 4]. He instructed

her to "hold" his current MERF "at this time." [*Id.*]. Ms. Robinson notified Mr. McMurray that his physician would need to complete his next MERF, and he "[v]erbalize[d] [his] understanding." [*Id.*].

But on August 22, before Mr. McMurray's follow-up appointment, Eastman made the decision to end his employment. [Termination Letter, doc. 21-4, at 1].[6] Eastman stated that he had "not complied with the process of providing continuing evidence of disability" until August 19. [*Id.*]. Eastman also pointed out that his medical records, when it received them on that date, contained "no indications [he] should be out of work or written restrictions." [*Id.*]. Eastman therefore concluded that his absence from work, from June through August, constituted "a failure to adhere to the [Plan]," which warranted his termination. [*Id.*]. After discharging him, Eastman discovered that he had also worked a pair of side jobs in 2013—one as the "own[er] and generat[or]" of a Virginia-based newspaper and one as a cattle rancher. [Pl.'s Interrog. Resp., doc. 15-25, at 2]. Eastman maintains that his participation in these side jobs is an additional ground for termination under the Plan, [Def.'s Br. at 18], which "automatically cease[s]" benefits "[t]he date you perform services for an employer other than the Company, even if you were employed with the other employer prior to the date your disability was incurred," [Plan at 4].

Mr. McMurray has now filed suit in this Court against Eastman, claiming it (1) interfered with his FMLA rights, in violation of 29 U.S.C. § 2615(a)(1) and (2) terminated him in retaliation for taking FMLA leave, in violation of 29 U.S.C. § 2615(a)(2). [Pl.'s

---

[6] Eastman made the decision to terminate Mr. McMurray on August 22, 2013, with his termination taking effect on August 23, 2013. [Termination Letter at 1].

Resp. at 2; Compl., doc. 1, ¶¶ 27–33]. Eastman moves for summary judgment on both of these claims. The Court will now address Eastman's motion.

## II.   LEGAL STANDARD

Summary judgment is proper when the moving party shows, or "point[s] out to the district court," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), (c). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's" claim or defense, *id.* at 325, at which point the nonmoving party, to survive summary judgment, must identify facts in the record that create a genuine issue of material fact, *id.* at 324.

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the case under the applicable substantive law, *id.*, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. When ruling on a motion for summary judgment, a court

must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A court may also resolve pure questions of law on a motion for summary judgment. *See Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 550 (6th Cir. 2015).

### III. ANALYSIS

The FMLA entitles employees to an annual total of twelve weeks of leave for numerous reasons including a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). After the employee returns from FMLA leave, the employer must restore him to his position or to an equivalent position. *Id.* § 2614(a)(1). An employer will be subject to civil liability if it "interfere[s] with, restrain[s], or den[ies] the exercise of or the attempt to exercise, any right provided under th[e] [FMLA]," *id.* § 2615(a)(1), or if it "discharge[s] . . . any individual for opposing any practice made unlawful by th[e] [FMLA]," *id.* § 2615(a)(2); *see id.* § 2617(a)(1).

The FMLA allows employers to run an employee's FMLA leave concurrently with their additional leave programs, *Hicks v. Leroy's Jewelers, Inc.*, No. 98-6596, 2000 WL 1033029, at *4 (6th Cir. July 17, 2000), like disability benefits programs:

> Generally, FMLA leave is unpaid leave. However . . . the employer may require the employee to substitute[7] accrued paid leave for unpaid FMLA

---

[7] "The term substitute means that the paid leave provided by the employer, and accrued pursuant to established policies of the employer, will run concurrently with the unpaid leave." 29

> leave. . . . When an . . . employer requires[] substitution of accrued paid leave, the employer must inform the employee that the employee must satisfy any procedural requirements of the paid leave policy only in connection with the receipt of such payment.

29 C.F.R. § 825.207(a). But when employers choose to run these programs simultaneously, they have to pad a straight line because they "may not discriminate against employees on FMLA leave in the administration of their paid leave policies." 29 C.F.R. § 825.207(a).

## A. Interference under § 2615(a)(1)

The familiar *McDonnell Douglas* burden-shifting framework[8] applies to FMLA interference claims, when an employee supports his claim with circumstantial evidence rather than with direct evidence. *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 427 (6th Cir. 2014); *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012). The term "direct evidence" means evidence that requires "no inferences" to reach the conclusion that FMLA interference "was a motivating factor" in the action that the employer initiated against the employee. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008) (citations omitted). A case that consists of direct evidence is "rare," *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998); it usually surfaces in "cases where the employer makes admissions of a discriminatory or retaliatory motive," *Mikols v. Reed City Power Line Supply Co.*, No. 1:07-CV-84, 2008

---

C.F.R. § 825.207(a).

[8] This framework has its origins in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Some courts refer to it as the "*McDonnell Douglas-Burdine*" framework because in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), the Supreme Court clarified its holding in *McDonnell Douglas*. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir. 2000).

WL 2696915, at *4 (W.D. Mich. July 1, 2008) (citing *Imwalle*, 515 F.3d at 544). The record in this case contains no admission of this sort, and the *McDonnell Douglas* framework therefore applies to Mr. McMurray's claim of FMLA interference.

To establish a prima facie case of interference under § 2615(a)(1), an employee has to show that (1) he is an eligible employee under the FMLA, (2) his employer qualifies under the FMLA's definition of an "employer," (3) he was entitled to FMLA leave, (4) he notified his employer of his intent to take leave, and (5) his employer denied his FMLA benefits. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). If the employee is able to meet these elements, a "mandatory presumption of discrimination is created," *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir. 2000) (citation omitted), and the burden then shifts to the employer to identify a legitimate, non-discriminatory reason for its actions, *id.*; *Demyanovich*, 747 F.3d at 427. If the employer carries this burden, the burden returns to the employee, who must show "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)). At summary judgment, sufficient evidence must exist to create a genuine factual dispute at each stage of the *McDonnell Douglas* inquiry. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).

### 1. Prima Facie Showing

Eastman argues that it "did not deny Plaintiff's request for FMLA leave" and therefore could not possibly have interfered with his FMLA rights. [Def.'s Br. at 13]. In

response, Mr. McMurray contends that Eastman interfered with his FMLA rights because it "neglected to acknowledge [his requests for] FMLA [leave] at all" and "did not adhere to [its] own policy regarding FMLA which entitled [him] up to 20 days upon returning to work to submit FMLA documentation." [Pl.'s Dep. at 14:21–25]. Mr. McMurray has the better side of the two arguments.

The fact that Eastman did not expressly deny Mr. McMurray's request for FMLA leave does not establish, in a case of circumstantial evidence, that it steered free from interfering with his FMLA rights. *See Payne v. Goodman Mfg. Co.*, 726 F. Supp. 2d 891, 900 (E.D. Tenn. 2010) ("Terminating an employee prior to the employee taking FMLA leave may constitute a denial of FMLA benefits."). "The issue [under an interference theory] is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking a medical leave." *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) (quoting *Hodgens v. Gen. Dynamics, Corp.*, 144 F.3d 151, 159 (1st Cir. 1998)). The record clearly establishes that Eastman did not permit Mr. McMurray to avail himself of the full twelve weeks of leave, his legal right. On August 20, he had yet to exhaust that amount of leave and had hand-delivered to Eastman's medical department new medical certification entitling him to more FMLA leave. [Pl.'s Aff. ¶¶ 38–39]. No term in Eastman's FMLA Policy forbade him from turning in his FMLA form before returning to work. And yet only two days after receiving this form, Eastman decided to terminate him. [Termination Letter at 1].

"The burden of proof at the prima facie stage is minimal," *Dixon v. Gonzalez*, 481 F.3d 324, 333 (6th Cir. 2007), and this evidence—specifically, the temporal proximity

between Mr. McMurray's obtainment of new medical certification for ongoing FMLA leave and his discharge—suffices to dispatch that burden, *cf. Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011) ("[T]he court correctly credited the [two-month period between the plaintiff's] leave and his firing as sufficient evidence of a causal connection between the two. Our precedents stand for the principle that timing matters." (citations omitted); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (providing that when "an adverse employment action occurs very close in time after an employer learns of a protected activity," this temporal proximity constitutes indirect evidence of a prima facie case). The burden now shifts to Eastman, which must identify a legitimate, non-discriminatory reason for its actions. *Demyanovich*, 747 F.3d at 427.

### 2. *Legitimate, Non-Discriminatory Reason*

In this next stage of the *McDonnell Douglas* analysis, Eastman argues that it terminated Mr. McMurray for a reason unrelated to his FMLA rights: his failure meet its requests for evidence of a disability under the Plan, [Def.'s Br. at 13], or more precisely, to produce a MERF, [Robinson Decl. ¶¶ 5, 9]. Eastman's contention that Mr. McMurray remained noncompliant with the Plan in this way constitutes a legitimate reason for his discharge. *Seeger*, 681 F.3d at 284–85; *Allen v. Butler Cty. Comm'rs*, 331 F. App'x 389, 395 (6th Cir. 2009).

### 3. *Pretext*

Mr. McMurray can show that Eastman's "proffered reasons for [his discharge] are pretext for discrimination if the reasons '(1) have no basis in fact; (2) did not actually

motivate the action; or (3) were insufficient to warrant the action." *Demyanovich*, 747 F.3d at 431 (quoting *Seeger*, 681 F.3d at 285). He relies on the first of these methods, maintaining that his Eastman's contention that he did not comply with the Plan "has no basis in fact." [Pl.'s Resp. at 23]. The Court agrees with him, at least to the extent that the record contains ample evidence to enable a reasonable jury to find that he did not violate the Plan.

Under the Plan, he had to submit a MERF to Eastman no later than two days after receiving its request for one. [Plan at 3]. The record establishes that Ms. Robinson last requested a MERF from him on August 19. [Robinson Decl. ¶ 9]. Neither party disputes that he provided her with a certified MERF less than two days later—on the very next day in fact, August 20, [Pl.'s Aff. ¶ 39; Robinson Notes at 4]—and that it contained work-related restrictions with a duration of one to two weeks, [MERF at 1]. As to whether he met Eastman's requests for a MERF before then, he says he did, and Eastman says he did not. [Pl.'s Aff. ¶¶ 22–27, 32; Robinson Decl. ¶¶ 5, 9]. The Court does not have license to resolve this factual dispute by weighing the evidence.[9] Whether Mr. McMurray failed to produce a timely MERF under the Plan—Eastman's "proffered reason[]" for terminating

---

[9] Eastman urges the Court not to consider Mr. McMurray's affidavit because it contradicts his deposition testimony, pointing out that "[i]t is well settled that 'a party may not create a fact issue by filing an affidavit that directly contradicts the party's earlier sworn testimony.'" [Def.'s Reply at 11 (quoting *Pennington v. Terry*, 644 F. App'x 533, 537 n.3 (6th Cir. 2016))]. But as far as the Court can tell, Mr. McMurray's testimony, which Eastman has filed only in fragmentary portions, matches the statements in his affidavit. [*Compare* Pl.'s Dep. at 22:9–13 ("Q: [Y]ou testified earlier that your—your physician had filled out short-term disability paperwork prior to this, correct? A: It's correct that they did fill out the short-term [disability] documents[.]"), *with* Pl.'s Aff. ¶ 32 ("I had filled out these same [disability] forms . . . on prior occasions [and] turned them in to the department's receptionist and also put them in [Ms.] Robinson's office box.")].

him—is a genuine issue of material fact that requires a jury's deliberation. *Seeger*, 681 F.3d at 285 (citation omitted).

### 4. After Acquired Evidence

Lastly, Eastman argues that the after-acquired evidence defense requires the Court to limit the types and amount of damages traditionally available to Mr. McMurray under his claim. [Def.'s Br. at 17–18]. In a discrimination case, this defense generally bars a plaintiff from receiving front pay and reinstatement when his employer learns, once into the case, that he had engaged in other wrongful conduct—previously unknown—and that this conduct would have been a further basis for his discharge. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 362 (1995); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1168 (6th Cir. 1996).[10] An employer must establish a pair of elements to stake its right to summary judgment under the after-acquired evidence defense: "[1] that the wrongdoing in fact occurred" and "[2] that the wrongdoing was of such severity that the employee in fact would have been terminated." *Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1150, 1154 n.5 (6th Cir. 1995) (quotation omitted).

### i. Mr. McMurray's Newspaper

Eastman first contends that it is entitled to summary judgment under this defense because during this litigation it learned that Mr. McMurray operated a newspaper while receiving disability benefits. [Def.'s Br. at 17]. If Eastman had known of this information,

---

[10] This defense, though it acts as a rampart against the recovery of certain damages, "cannot be used to shield a defendant from *liability*." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 513 (6th Cir. 2006) (emphasis added).

it claims it would have fired him, [Def.'s Br. at 17; Summar Decl., doc. 15-1, ¶ 6], for breaching the Plan, which states: "[B]enefits automatically cease . . . . [on] [t]he date you perform services for an employer other than the Company," [Plan at 4]. Mr. McMurray, however, asserts that he did not work as an employee of the newspaper. [Pl.'s Aff. ¶ 79; Pl.'s Suppl. Resp. at 2]. Mr. McMurray's argument is adequate to fend off Eastman's pursuit of summary judgment under the after-acquired evidence defense.

The record does not establish that Mr. McMurray was ever an employee of the newspaper; rather, he declared only that he was the newspaper's *owner*, having "started" it. [Pl.'s Interrog. Resp. at 2]. The difference is not inconsequential under the Plan, which proscribes a recipient of disability benefits from being "*employed*" by "an *employer* other than the Company," [Plan at 4 (emphasis added)]. An employee and an owner, by their plain meaning, are not the same, and Eastman does not reconcile the difference between the two. *Cf. Perez v. Aetna Life Ins. Co.*, 150 F.3d 500, 556 (6th Cir. 1998) ("The general principles of contract law dictate that we interpret the Plan's provisions according to their plain meaning, in an ordinary and popular sense." (citation omitted)); *compare Employee*, *Black's Law Dictionary* (10th ed. 2014) (defining "employee" as a person "who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance"), *with Owner*, *Black's Law Dictionary* (defining "owner" as a person with "the right to possess, use, and convey something"). In light of this distinction, and without additional evidence, the Court cannot accept Eastman's contention that the record establishes—beyond any

material dispute—that "the wrongdoing was of such severity that [Mr. McMurray] in fact would have been terminated." *Wehr*, 49 F.3d at 1154 n.5 (quotation omitted).

### ii. Mr. McMurray's Involvement in Ranching

Under the after-acquired evidence defense, Eastman also contends that it is entitled to summary judgment because during this litigation it learned that Mr. McMurray earned income by helping his father with cattle ranching on a "year round" basis. [Def.'s Br. at 18 (quoting Pl.'s Dep. at 6:15)]. According to Eastman, if it had previously known of this information, it would have terminated him, [Def.'s Br. at 17–18; Summar Decl. ¶ 6], for breaching the Plan, [*see* Plan at 4]. In response, Mr. McMurray filed an affidavit in which he swears that he did not participate in cattle ranching while receiving disability benefits between June 2013 and August 2013 because his physician ordered him to rest and avoid physical activity. [Pl.'s Aff. ¶ 80]. Eastman now contends that this assertion conflicts with his deposition testimony, [Def.'s Reply at 12], in which he referred to ranching as a "year round" and "continual[]" activity:

> Q: Is cattle ranching a year-round job or is it seasonal?
>
> A: It would be year-round.
>
> Q: Have you been continually cattle ranching or was there ever . . .
>
> A: Yes.
>
> Q: . . . a time when you took any time off from cattle ranching?
>
> A: No.

[Pl.'s Dep. at 6:13–21].

Eastman does not convince the Court that Mr. McMurray, in his affidavit, has doubled back on this deposition testimony. At summary judgment, though a "party may not create a factual issue by filing an affidavit . . . which contradicts her earlier deposition testimony," *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (citation omitted), the contradiction between the two—to warrant action by the Court—has to be unequivocal, *see Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (noting that courts require a "later affidavit" to "flatly contradict[]" previously sworn deposition testimony (citations omitted)); *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 907, 908 (6th Cir. 2006) (recognizing that an affidavit has to "directly contradict[]" prior deposition testimony and observing that a contradiction "*to some degree*" is immaterial) (quotation omitted)); *Peck v. Bridgeport Machs., Inc.*, 237 F.3d 614, 619 (6th Cir. 2001) (concluding that the plaintiff's post-deposition affidavit could not stave off summary judgment against him because it was "plainly contradictory"). Mr. McMurray's affidavit does not fit this mold, creating at most only some level of separation from his deposition testimony.

Mr. McMurray's general description of ranching as "year-round" and "continual[]" is not unmistakable evidence establishing that he performed this type of work while ill between June 2013 and August 2013. Eastman never expressly asked him whether he ranched during this particular timeframe. And although he testified that he did not take time off from ranching in the past, he could have easily been referring to the time up until his illness. The testimony is not entirely clear. Besides, Mr. McMurray's financial records illustrate that his profits from ranching fell by approximately $6,000 in 2013—evidence that permits the Court to infer that he did not ranch with his customary frequency during

that year. [Pl.'s Interrog. Resp. at 2]. The record, when the Court considers it in the light most favorable to Mr. McMurray, therefore establishes that Eastman has not satisfied its burden for summary judgment under the after-acquired evidence defense.

## B. Retaliation under § 2615(a)(2)

As with an FMLA interference claim, the *McDonnell Douglas* framework applies to an FMLA retaliation claim when an employee supports it with circumstantial evidence instead of direct evidence. *Clark*, 424 F. App'x at 472–73. To erect a prima facie case of retaliation under § 2615(a)(2), an employee has to establish that (1) he was engaged in protected activity under the FMLA, (2) his employer knew of the protected activity, (3) his employer subjected him to an adverse employment action, and (4) a causal nexus was present between the protected FMLA activity and the adverse action. *Seeger*, 681 F.3d at 283. "[T]he employer's motive is an integral part of the analysis" in a claim of FMLA retaliation. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (emphasis and citation omitted).

Eastman targets the last element of the analysis, the causal connection, contending that causation is absent because the record is clear that it fired Mr. McMurray for defying the Plan. [Def.'s Br. at 19]. An employee's "burden to show causation entails 'requiring the [employee] to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible.'" *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 533 (quoting *EEOC v. Avery Dennison Corp.*,

104 F.3d 858, 861 (6th Cir. 1997)). An employee may rely on direct or circumstantial evidence to support the causal connection. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 305 (6th Cir. 2012).

In arguing that evidence of the requisite causal connection does not exist in the record, Eastman asks the Court not to consider any evidence of the temporal proximity between Mr. McMurray's FMLA leave and his termination, [Def.'s Br. at 20], despite his evidence to this effect, [Pl.'s Aff ¶¶ 38–39; Termination Letter at 1], which was a previous topic of the Court's discussion. According to Eastman, evidence of temporal proximity, when "standing alone, is insufficient to establish a causal connection for a retaliation claim." [Def.'s Br. at 20 (quoting *Tuttle v. Metro Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007)]. The record, however, contains other evidence of a causal nexus, evidence that extends beyond temporal proximity alone.

Mr. McMurray presents evidence showing that he did not initially apply disability benefits and that the Plan did not require him to apply for disability benefits while on medical leave. [Pl.'s Aff. ¶¶ 47, 53]. Eastman does not argue otherwise, yet it deposited the benefits into his account anyway. [Earnings Statement at 1–5]. The record is unclear as to exactly why this was the case. Eastman states—without citing supporting evidence—that it automatically distributes disability benefits to "all employees" who take medical leave, [Def.'s Reply at 7], whereas Mr. McMurray contends that Eastman "coerced" him into applying for them, [Pl.'s Resp. at 1]. When the Court views the evidence in the light most favorable to Mr. McMurray, his theory has support. An employer cannot foist a paid leave program on an employee in lieu of FMLA leave, when, as here, the employee

undeniably requests FMLA leave. *See Allen*, 331 F. App'x at 396 ("[W]hen an employee misses work for an illness that qualifies under both his employer's paid sick leave policy and the FMLA, his employer could elect to have the absence count as paid sick leave rather than FMLA leave and would then be free to discharge him without running afoul of the [FMLA]." *Allen*, 331 F. App'x at 396 (quoting *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1205 (11th Cir. 2001))).

The record contains no graspable evidence showing that Eastman ever formally placed Mr. McMurray on concurrent FMLA leave, provisional or otherwise, despite his requests for it. Eastman even concedes that it had yet to approve Mr. McMurray's FMLA leave by the time it chose to terminate him, [Summar Decl. ¶ 2], though he turned in his paperwork weeks earlier, [Pl.'s Aff. ¶ 10]. Mr. McMurray wanted only FMLA leave, but the evidence indicates that Eastman instead lassoed him into a disability plan. Indeed, he presents evidence showing that an application for disability benefits under the Plan is not mandatory, [Pl.'s Aff. ¶¶ 47, 53], that he did not originally apply for them, [*id.* ¶¶ 16, 18], that Eastman knew he did not apply for or desire them, [*id.* ¶¶ 18, 30–31], and that he resorted to filing paperwork for disability benefits, namely a MER, only at Eastman's behest, [*id.*]. Based on all this evidence, a reasonable jury could very well detect an unsavory motive when considering the fact Eastman discharged him for failing to honor the terms of a Plan that was optional and that the evidence shows he did not voluntarily take part in. *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 342–43 (6th Cir. 1997) (stating that "[p]retext is established by . . . an indirect showing that the employer's explanation is not credible" (citation omitted)); *cf. Gunn v. Senior Servs. of N. Ky.*, 632 F. App'x 839, 847

(6th Cir. 2015) (indicating that "material inconsistency" in an employer's reason for terminating an employee could raise an inference of pretext).

This evidence of pretext, standing alongside the evidence of temporal proximity, is sufficient for Mr. McMurray to overcome summary judgment, not only as it relates to the causal element of his prima facie case but also as to his broader claim of FMLA retaliation. *See Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 506 (6th Cir. 2014) (recognizing that "temporal proximity with other evidence of retaliatory conduct is enough to establish a causal connection" (citations omitted)); *Philbrick v. Holder*, 583 F. App'x 478, 490 (6th Cir. 2014) ("[A] court may . . . consider evidence of pretext to buttress th[e] [causal] prong of the prima facie case. . . . [and] in retaliation cases, the same type of evidence may be used to prove both." (citation omitted)). The Court will therefore permit Mr. McMurray's FMLA retaliation claim to continue to a jury.

## IV.  CONCLUSION

As the movant for summary judgment, Eastman fails to meet its burden of showing the absence of evidence to support either of Mr. McMurray's FMLA claims. Eastman's Motion for Summary Judgment [doc. 13] is therefore **DENIED**.

**IT IS SO ORDERED.**

ENTER:


s/ Leon Jordan
United States District Judge